**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **CHARLOTTE LEVINE-DIAZ,** | |
| Plaintiff, | |
| v. | CIV. NO. 10-2090(PG) |
| **HUMANA HEALTH CARE,** | |
| Defendant. | |

**OPINION AND ORDER**

Plaintiff Charlotte Levine-Diaz (hereinafter "Plaintiff" or "Levine") filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"), against her former employer Humana Health Plans of Puerto Rico, Inc.[1] ("Humana" or "Defendant"), alleging discrimination on the basis of sex and gender, sexual harassment and retaliation for engaging in protected conduct. <u>See</u> Docket No. 1. In summary, Levine claims that the Defendant discriminated against her, subjected her to a hostile work environment in her employment and eventually terminated her because of her sex and in retaliation for complaining of sexual harassment and other unlawful employment practices. <u>See id.</u> The Plaintiff also invoked supplemental jurisdiction over her state law claims under Law No. 100 of June 30, 1959 ("Law No. 100"), P.R. LAWS ANN. tit. 29, § 146, *et seq.*; Law No. 17 of April 22, 1988 ("Law No. 17"), P.R. LAWS ANN. tit. 29, § 155 *et seq.*; Law No. 69 of July 6, 1985 ("Law No. 69"), P.R. LAWS ANN. tit. 29, § 1321 *et seq.*; Law No. 115 of December 20, 1991 ("Law No. 115"), P.R. LAWS ANN. tit. 29, §§ 194a, *et seq.*; and, Law No. 80 of May 30, 1976, P.R. LAWS ANN. tit. 29, § 185, *et seq.*.[2]

---

[1] In its answer to the complaint, the Defendant alleges that it was "erroneously identified in the caption of the Complaint as 'Humana Health Care,'" <u>see</u> Docket No. 7 at page 1.

[2] In her complaint, the Plaintiff also alleges that the Defendant's "actions and omissions" were in violation of "the constitutions and laws of the Commonwealth of Puerto Rico, as well as of the United Sates of America," <u>see</u> Docket No. 1 at page 7, and requests that the court enter "a declaratory judgment against the defendant, due to violations of the Constitution and Laws of the United States of America and of the Commonwealth of Puerto Rico." <u>See id.</u> at page 9. In its motion for summary judgment, the Defendant requests the dismissal of these claims for lack of merit. <u>See</u> Docket No. 23 at pages 26, 30. The Plaintiff, not only fails to flesh out these claims in her complaint, but also omitted to

     Before the court is the Defendant's Motion for Summary Judgment (Docket No. 22-23), Plaintiff's Opposition (Dockets No. 34) and Defendant's Reply (Docket No. 45). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the Court **GRANTS IN PART AND DENIES IN PART** the Defendant's motion for summary judgment for the reasons explained below.

## I. SUMMARY JUDGMENT STANDARD

     A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

     To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests

---

oppose the Defendant's request for their dismissal. See Docket No. 34. Pursuant to this circuit's well established "raise-or-waive" rule, the Plaintiff's failure to discuss or cite authorities in support of these claims in her opposition to Defendant's motion for summary judgment is "tantamount to waiver." Lopez-Cruz v. FPV & Galindez, PSC, 922 F.Supp.2d 225, 239 (D.P.R. 2013) (citing Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir.2003)). Therefore, Defendant's motion for summary judgment is **GRANTED** as to these unopposed causes of action, and Plaintiff's claims under the Constitution of the United States of America and the Commonwealth of Puerto Rico are hereby **DISMISSED WITH PREJUDICE.**

merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## II. FACTUAL FINDINGS

Before setting forth the facts found by this court to be undisputed and relevant to the matter at hand, we must first address several compliance issues presented to the court when reviewing Plaintiff's statements of facts.

In addition to Federal Rule of Civil Procedure 56, the local rules of civil procedure govern the parties' submissions of summary judgment materials. See L.Cv.R. 56 (D.P.R.2009). Regarding the filing of opposing statements of material facts, Local Rule 56(c) states as follows:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

L.Cv.R. 56(c). "This separate section containing additional facts is necessary to allow the moving party to reply to those additional facts and to allow the court to easily determine the disputed facts. … Therefore, a party may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts." Malave-Torres v. Cusido, 919 F.Supp.2d 198, 207 (D.P.R. 2013) (internal citations omitted).

In its reply, the Defendant complains that, in her attempt to controvert the facts the Defendant proposed, Levine denied facts without evidentiary

support or by citing incomplete portions of her deposition, contradicted her prior statements, and qualified the fact in question with irrelevant and unrelated new allegations. See Docket No. 45 at pages 3-4. After reviewing the Plaintiff's objections to the Defendant's statement of uncontested facts (Docket No. 34-1), the court found that the Plaintiff did not include a separate section of additional facts. Instead, she proposed additional facts in the same numbered paragraphs wherein she admitted, denied or qualified the Defendant's proposed factual statements. And while the court understands that a party asserting that a fact is genuinely disputed must support the assertion with record citations, see FED.R.CIV.P. 56(c)(1), the Plaintiff, for the most part, incorporated her own version of events in the paragraphs where she opposed the Defendant's and in the body of her response memorandum. The court is under no obligation to "sift through Plaintiff's responses to locate additional facts." Malave-Torres, 919 F.Supp.2d at 207. Therefore, the court will "disregard any additional facts provided by [Plaintiff] when denying or qualifying [Defendant's] statement of uncontested facts." Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 137 (1st Cir.2012).

The Defendant also complains in its reply that the Plaintiff, in her opposition, "resorts to a sham affidavit which contains conclusory allegations, lacks foundation and, notably, is based on hearsay and, also, on information which contradicts her deposition testimony." Docket No. 45 at page 3. "It is settled that '[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.'" Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir.2000) (citing Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir.1994)). Nonetheless, "[e]ven a clearly self-serving affidavit constitutes evidence which the court must consider when resolving summary judgment motions." Malave-Torres, 919 F.Supp.2d at 204 (citing Cadle Co. v. Hayes, 116 F.3d 957, 961 n. 5 (1st Cir.1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.")). In determining whether an affidavit is admissible, the analysis of whether the affidavit should be stricken from a party's opposition to a motion for summary judgment does not simply end with a determination that the affidavit is self-serving inasmuch as the court must determine whether it is a sham. See id.

After carefully reviewing the testimony given in Plaintiff's deposition versus her statement under penalty of perjury, the court disregarded the contents of the latter only to the extent it was either incongruent with her deposition testimony or the matter in question was the subject of extensive questioning during deposition, yet she decided to elaborate further in her affidavit. The court, however, considered the Plaintiff's affidavit when it properly addressed, qualified or denied the content of a statement of fact set forth by the Defendant and the matter was not subject to questioning during her deposition or the affidavit properly clarified her response.

In accordance with the foregoing, the court found the following relevant facts were undisputed:

1.   On February 20, 2006, Levine started working at Humana as a Customer Service Specialist in its Call Center.

2.   Levine was an hourly employee.

3.   On February 20, 2006, Levine acknowledged having been informed that Humana Associate Work-Life Policies & Processes were located on Humana's Intranet and instructed on how to access these materials. With her signature, she also committed to access the materials and become familiar with them within the first week of employment. The acknowledgment she signed also advised her to contact her manager, a Human Resources consultant or the Central Systems Support if she was unable to view or did not have access to the policies.

4.   Humana's Nondiscrimination, Harassment and Attendance Expectations policies are part of its Work-Life Policies & Processes.[3]

5.   Levine has knowledge of Humana's non-discrimination, anti-harassment, and anti-retaliation policies. She received training on these policies as part of an annual mandatory Ethics & Compliance Training, as well as in two other occasions.

6.   During Levine's employment at Humana, there were about 40 customer service specialists in Humana's Call Center. They were divided into units. She was in the "providers" unit. Her unit had to deal with the commercial, "Reforma" and Medicare service lines.

---

[3]In its statement of uncontested facts (Docket No. 22-1), the Defendant makes reference to the content of Humana's "Attendance Expectations" policy and, in support of its content, attaches a document dated 10/7/2007, see Docket No. 22-9, which is more than a year after the Plaintiff began working for the Defendant and acknowledged receipt of its policies. The Plaintiff, in her affidavit, denies the policy was in place at the time she started working for the Defendant. See Docket No. 34-2 at ¶ 4. Accordingly, the court will not consider the content of said policy at this juncture.

7.   As part of her job duties as a Customer Service Specialist, Levine had to provide service to Humana's providers, respond to their inquiries and requests, process claims, maintain membership records, resolve providers' problems.

8.   Levine needed to be "logged in" on the phone a certain percent of time during her working hours.

9.   The employees that worked with her at the providers' unit had different work schedules. They did not come in at the same time. Some would come in earlier and some later. By the same token, some would leave earlier and some stay until later so as to ensure full coverage during service hours.

10.  Orlando Carrasquillo ("Carrasquillo"), Front Line Leader, was always Levine's direct supervisor. He, in turn, reported to Victor Carreras ("Carreras"), Service Operations Manager. Cynthia Feliciano was the Director of the Call Center.

11.  On April 19, 2006, Levine was admonished by Carrasquillo for punching in late after her meal period.

12.  On May 24, 2006, Levine met with her supervisors to discuss the results of a quality control audit on which she did not comply with the established target regarding handling of calls and to point out some areas where she needed to improve.

13.  On December 5, 2006, Levine met with Vilma Benítez ("Benítez"), Human Resources Consultant, to complain about inappropriate comments made by Carreras. She put her complaint in writing.

14.  Levine received a memorandum dated December 19, 2006, regarding the results of the investigation conducted as a result of her complaint. In the memo, Benítez stated that she met with Carreras, who recognized the comment as "unfortunate."

15.  Other than Benítez, Levine did not talk to Carreras or anyone else about the harassment incident.

16.  Admittedly, after filing the December 2006 complaint, the sexual comments stopped.

17.  As of August 2007, Levine was required to call her supervisor and the sick line to inform if she was going to arrive late or be absent from work. Upon her return from her absence, she had to hand in a medical certificate, if her absence was for more than two (2) days.

18.    On September 24, 2007, Levine was placed in a Competency & Contribution Improvement Plan ("CCIP"), due to performance shortcomings, for a period of 30 days. She was expected to improve her performance in maintaining her schedule hours / wait and ready time up to Humana's expectations, comply with the connection time, take her breaks and meal periods on the established schedule, and to avoid the use of "not ready" during her working hours. She complied with the CCIP.

19.    During her CCIP, Levine met with Carrasquillo as well as with another supervisor, Ms. Villegas, to discuss her progress. She met with Ms. Villegas because Carrasquillo went on vacation during part of that period.

20.    Levine received a disciplinary warning dated November 9, 2007. She was disciplined for the way she handled phone calls with respect to two separate incidents that involved a supervisor and a provider. She met with Carrasquillo to discuss the warning. Levine refuted the warning.

21.    On November 30, 2007, Carrasquillo verbally admonished Levine for leaving her work station. According to Levine, he screamed at her in front of her co-workers. Levine became defensive. As this was happening, Carreras stepped out from his office to inquire what was happening, to which Levine answered that she did not think it was a matter to discuss in front of everyone. Thereafter, the three met to discuss the incident. No formal reprimand was issued.

22.    Levine's original work schedule was from 8:30a.m. to 5:30p.m. Afterward, it changed from 8:45a.m. to 5:45p.m., then 8:15a.m. to 5:15p.m., and finally from 8:00a.m. to 5:00p.m..

23.    In order to be able to pick up her son from day-care and take him to therapy, Levine requested a reduction in her meal period to a half-hour so that she could leave at 4:30 p.m. instead of at 5:00 p.m. Starting on February 9, 2009, Humana agreed to this request. This arrangement lasted until October 2009.

24.    On July 9, 2009, Levine asked Carrasquillo whether a change in her working schedule was possible. She either wanted a permanent work schedule from 7:30 a.m. to 4:30 p.m., or to take Fridays off and work instead on Saturdays. It should be noted that, at this time, Levine was still under her work schedule from 8:00a.m. to 4:30p.m..

25.    On July 13, 2009, Carrasquillo sent an email to Levine informing that her vacation scheduled from July 27 until August 7, 2009 was going to be

cancelled because her vacation days had been used to credit them for her absences because she had exhausted all her sick days as of July 2009. On that same day, Plaintiff replied acknowledging that she had no vacation days available. Again, on July 14, 2009, Levine acknowledged that she had no leave hours available.

26. On July 14, 2009, Carrasquillo sent an email to Levine saying that they were still looking at options in connection with her request to change her work schedule in order to be able to go to her son's medical appointments because she had no more sick leave. In the meantime, he suggested Levine talk to her co-workers to see whether any of them was willing to switch the work schedule with her so that she could take the next Friday off and take her child to the appointment scheduled for that day.

27. In the end, Levine went to the doctor's appointment under an unpaid Family Medical Leave Act ("FMLA") leave since she had no paid sick or vacation leave hours available.

28. Levine filed another complaint on July 31, 2009, when she called Humana's Ethics Line about work-related matters.

29. On July 31, 2009, Levine called Humana's Ethics Line, located at Louisville, Kentucky, to complain that Carreras intimidated and harassed the Call Center employees.

30. In connection to her call, on August 13, 2009, Levine sent an email to Damaris Cruz ("Cruz"), from Associate Relations, asking about the policy concerning the need to include a diagnosis on medical certificates and complaining about the lack of training after all the employees in the Call Center were required to "multi-skill."

31. In this e-mail, the Plaintiff also complained that Carreras is a very intimidating man. She also stated that, after complaining against Carreras in 2006, things became very tense for her at work causing her to be sick of her nerves and depressed. According to Levine, Carreras is watchful of her personal conversations, has denied her participation in a focus group she had been invited to by Human Resources, and denied her a change in work schedule.

32. On August 17, 2009, Cruz replied to Levine clarifying the medical certificate inquiry and advising that FMLA leave does require that the employee provide specific documentation required by law. Cruz also asked follow-up questions to Levine regarding her August 13th email.

33.   On August 18, 2009, Levine replied by email to Cruz. She described "tense situations" with Carreras both before and after her sexual harassment claim against him, and stated that he was always talking loudly, laughing sarcastically and talking about things that she did not want to listen to.

34.   After the complaint dated July 31, 2009, Levine called the Ethics Line on three (3) additional occasions to inquire about available benefits for Humana employees regarding leaves of absence.

35.   On August 27, 2009, Levine called the Ethics Line to inquire about the FMLA because she was being asked by her supervisor to fill out FMLA documentation and she did not think she needed to because she has been absent for four (4) days and it was due to a virus. She was advised that she was not obligated to fill out FMLA paperwork, but that her supervisor could suggest so. She was also advised that FMLA provided her with job protection for the days that she was absent and that, even though she had a doctor's note, the absences could still count against her and that, if the absence was ultimately covered by the FMLA, those days could not be counted against her.

36.   On September 3, 2009, Levine called the Ethics Line to inquire about any benefit that Humana may have that would pay her to stay off from work to care for her sick child. She was advised that Humana provides FMLA, vacation and sick leaves and that she could use them to take care of her child.

37.   On September 14, 2009, Levine called Carrasquillo and requested a reduction of hours from full to part time for a period of three (3) months. Carrasquillo asked her to submit the requested in writing, specifying the beginning and end dates of her request.

38.   The request was never granted.

39.   On September 25, 2009, Levine had a phone interview with Cruz in which she had the opportunity to explain all her discomforts. On that conversation, Levine was advised that it was not up to Carreras to make the decision as to her request for a change in her work schedule, but up to Human Resources.

40.   However, on that phone interview, Levine admitted that a special schedule had been arranged in February or March 2009 and was still in effect. Nothing was said or discussed regarding gender discrimination or sexual harassment.

41.   On October 2, 2009, Cruz sent Levine an email informing that the
      investigation was closed for lack of merit.

42.   On October 5, 2009, Levine was notified that she had to take a meal
      period of one hour and that, she would no longer have the 30-minute meal
      period reduction. As a result, she was informed that, effective October
      26, 2009, she was going to return to her regular schedule from 8:00 a.m.
      to 5:00 p.m. This decision was made by the Human Resources Department.

43.   As a result of the Defendant's change in Plaintiff's work schedule, on
      October 5, 2009, Levine sent an email to Carrasquillo requesting a
      permanent change in work schedule from 7:30 a.m. to 4:30 a.m. in order
      to be able to take her son to occupational therapies because he suffered
      from autism. In the email, Levine specifically asked what steps she
      needed to take in order for the change to take place. See Docket No. 30-
      8; Docket No. 34-2 at ¶ 27.

44.   During the month of October 2009, she showed up to work for five (5)
      full working days and partially worked on three (3) other days out of
      the twenty (22) workings days she was scheduled to work.

45.   Notwithstanding the fact that she had exhausted all paid sick and
      vacation leave days, as well as all FMLA leave, Levine was absent
      eighteen (18) days during the period from September 15, 2009 to October
      30, 2009.

46.   Levine submits that her absences in the month of October of 2009 were
      due to the hospitalization of her infant son due to bronchiolitis from
      October 21 or 22, until October 27th, 2009, and also due to the fact
      that the Plaintiff was sick from October 13th until October 19th, 2009,
      with medical certificate. Levine was also absent on October 21 and 22,
      2009, due to the fact that her daughter had bronchitis, also confirmed
      by a medical certificate. Levine, during all of her absences in the
      month of October 2009, contacted her supervisor and the sick line and
      provided medical certificates. See Docket No. 34-4 at pages 207-227.

47.   On October 26, 2009, Levine called the Ethics Line wondering why
      Madeline Rosario from Humana's Human Resources Department was requesting
      her to take in some documentation regarding her son's hospitalization.
      She stated that she had already turned in the FMLA paperwork but was now
      told that she had exhausted her FMLA leave. Levine was advised that if
      she had used the 480 hours of FMLA leave, her job was not protected

    under this statute and that she should follow Human Resources'
    instructions to see what they could do to help her.

48.  The last day that Levine reported to work was on October 19, 2009.

49.  After having exhausted her sick, vacation and FMLA leaves, Levine was
    terminated from her employment effective October 30, 2009.

50.  The termination memo dated October 27, 2013 states that since October
    22, 2009, Levine had been absent from work without any written
    communication with her supervisor Carrasquillo and that she had
    exhausted all available leaves. The memo also granted the Plaintiff
    until October 30th, 2009 to submit evidence about her absences,
    otherwise, the Defendant would understand that she was abandoning her
    employment. See Docket No. 30-9.

51.  Plaintiff alleges that on October 27, 2009, she gave Carrasquillo the
    requested medical certificates regarding her son's hospitalization and
    her daughter's bronchitis. See Docket No. 34-1 at ¶ 61, Docket No. 34-4
    at pages 224-225.

52.  The decision to terminate her employment was made by Benítez, Carreras
    and Carrasquillo.

53.  Levine requested leaves under the Family and Medical Leave Act ("FMLA")
    in April 2008, as well as in April and August 2009.

54.  In December 2008 and January 2009, Levine was approved FMLA leave
    concurrently with her maternity leave, for a total of 328 FMLA hours.

55.  Levine began using the balance of her FMLA hours in May 2009. Between
    May and September 2009, Levine used a total of 164.37 FMLA hours for
    various reasons, but primarily to take care of an ailing child.

56.  Humana's intranet, also known as HOWIE (Humana Online Web Information
    Exchange) and Levine's time sheets provide her with the balances of
    vacation and sick leaves.

57.  According to Humana's FMLA policy, when the reason for FMLA leave is to
    care for a dependent (spouse, child or parent) with a serious health
    condition, the associate is required to substitute and use available
    sick and vacation days concurrently with the remaining FMLA leave.

58.  From December 2008 until September 15, 2009, Levine had taken 511.37
    hours of FMLA leave, that is, 31.37 hours in excess of the statutory 480
    hours during a 12-month period.

59.  On December 3, 2009, Levine called the Ethics Line and asked for an
    investigation about her employment termination. She sent the documents

they requested for the investigation. The Ethics Line explained to her that her termination was because she continued to be absent from work notwithstanding having exhausted all available sick, vacation and FMLA leaves.

60.   On December 4, 2009, Levine filed a discrimination and retaliation charge before the Equal Employment Opportunity Commission ("EEOC").

61.   On August 6, 2010, the EEOC issued a right-to-sue letter.

## III. DISCUSSION

Plaintiff claims the Defendant discriminated against her and subjected her to a hostile work environment in violation of Title VII and local laws because of her sex and gender. Plaintiff also asserts that she was the victim of retaliation for opposing the Defendant's unlawful employment practices under Title VII and under various local law claims.

## A. Title VII Claims

At the outset, the court must address a threshold matter regarding the Plaintiff's sex discrimination claim. In the Defendant's motion for summary judgment, Humana argued that the Plaintiff's allegation that she was discriminated against because of her "single mother status" is without merit because the same is not a protected category under Title VII. See Docket No. 23 at page 6. In her opposition, the Plaintiff responded as follows:

> The plaintiff nevertheless will withdraw Levine's allegations regarding sex and gender discrimination, under Title VII, as well as those under the statutes of the Commonwealth of Puerto Rico. Thus, plaintiff's remaining causes of action are those related to harassment, discrimination, and retaliation, due to plaintiff's sex and gender harassment discrimination complaint, and also those related to hostile working environment, due to plaintiff's opposition against defendant's unlawful employment practices.

See Docket No. 34 at page 1. Although not particularly clear, the court - and the Defendant in its reply - understand, then, that the Plaintiff refrains from pursuing her sex discrimination claims under Title VII and local laws, and that the court should only consider her claims for sexual harassment, a hostile work environment and retaliation. As a result, the court hereby **DISMISSES WITH PREJUDICE** the Plaintiff's sex discrimination claim as requested and addresses the remaining claims in turn.

### 1. Sexual Harassment

Title VII, which prohibits discrimination because of sex, provides "that '[i]t shall be an unlawful employment practice for an employer … to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)). "[S]exual harassment is a form of sex discrimination, the Supreme Court tells us — by committing or tolerating sexual harassment against an employee, an employer has effectively altered the terms or conditions of the victim's job." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 136 (1st Cir.2013) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). "There are various types of actionable sexual harassment claims under Title VII: hostile work environment claims, *quid pro quo* harassment claims and retaliation claims." Perez v. Developers Diversified Realty Corp., 904 F.Supp.2d 156, 163 (D.P.R. 2012) (citing Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir.2006)). In the case at hand, the Plaintiff complains of a hostile work environment in the workplace.

### a. Hostile Work Environment

In its motion for summary judgment, the Defendant contends that Plaintiff's claim with regards to the incident of sexual harassment she complained of in December of 2006 is time-barred. Humana also argues that, with regards to all other incidents, the Plaintiff fails to establish the second, fourth, fifth and sixth elements of the prima facie case. In response, Levine argues that even her claims for incidents outside the limitations period are timely because the continuing violations doctrine renders them actionable. In light of the parties' arguments set forth in their moving papers, the court finds that the Plaintiff's case presents questions involving both the timeliness and the merits of a hostile work environment claim under Title VII. "[I]n the case of an alleged continuing violation constituting a … hostile work environment, the question of timeliness is closely intertwined with the substance of the claim." Cordero-Suarez v. Rodriguez, 689 F.3d 77, 81 (1st Cir.2012) (citing O'Rourke v. City of Providence, 235 F.3d 713, 732 (1st Cir.2001)). We shall thus address both issues together.

We begin our analysis with the hostile work environment framework in the context of a sexual harassment claim under Title VII. "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment … ." 29 C.F.R. § 1604.11 (2010). "One type of sexual harassment … involves 'bothersome attentions or sexual remarks' so 'severe or pervasive' that they create a 'hostile work

environment.'" <u>Medina-Rivera</u>, 713 F.3d at 136 (internal citations omitted). A Title VII hostile work environment claim exists where a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (<u>quoting</u> <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. <u>See</u> <u>Forrest v. Brinker Intern. Payroll Co., LP</u>, 511 F.3d 225, 228 (1st Cir.2007) (internal citations and quotations omitted).

> Generally, the key elements of a hostile-work-environment claim are these: (1) the plaintiff belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create a discriminatorily-abusive work environment; (5) the complained-of conduct was both objectively and subjectively offensive; and (6) there is a basis for employer liability.

<u>Medina-Rivera</u>, 713 F.3d at 137 n. 2.

Under the provisions of 42 U.S.C. § 2000e-5(e)(1), before filing suit in federal court, a plaintiff must file a charge with the EEOC within 180 or 300 days after the alleged unlawful employment practice took place. "'In Puerto Rico, an aggrieved employee has 300 days from the occurrence of the employment action complained of to file an administrative charge in instances where the local Department of Labor is empowered to provide relief, i.e., in instances of 'deferral' jurisdiction.'" <u>Cintron-Garcia v. Supermercados Econo, Inc.</u>, 818 F.Supp.2d 500, 507 n. 4 (D.P.R. 2011) (<u>citing</u> Rivera Abella v. Puerto Rico Telephone Co., 470 F.Supp.2d 86, 102 (D.P.R.2007)). <u>See also</u> <u>Bonilla v. Muebles J.J. Alvarez, Inc.</u>, 194 F.3d 275, 278 n. 4 (1st Cir.1999); <u>Lebron-Rios v. U.S. Marshal Service</u>, 341 F.3d 7, 11 n. 5 (1st Cir.2003)). "Otherwise, the applicable period is 180 days." <u>Rivera Abella</u>, 470 F.Supp.2d at 103 (<u>citing</u> 42 U.S.C. § 2000e-5(e)(1)).

Notwithstanding the foregoing, the existence of a continuing violation may toll the limitations period for filing an initial claim with either the EEOC or a local antidiscrimination agency. <u>See</u> 42 U.S.C. § 2000e-5(e)(1). "The continuing violation doctrine 'is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are

deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims.'" Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 144 (1st Cir.2012) (citing O'Rourke, 235 F.3d at 730; Cordero-Suárez, 689 F.3d at 83 (1st Cir.2012)). "Such tolling is an equitable means of ensuring that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature." Loubriel, 694 F.3d at 144 (citing Thomas v. Eastman Kodak Co., 183 F.3d 38, 54 (1st Cir.1999)).

> [A]ctions of informal harassment, as opposed to formal employment actions like transfers or demotions, amounting to a hostile work environment can rise to the level of a challengeable employment action, … but only if the discriminatory acts are sufficiently severe … . … And because hostile work environment claims do not turn on single acts but on an aggregation of hostile acts extending over a period of time, … the applicable statute of limitations will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period.

Cordero-Suárez, 689 F.3d at 82 (internal citations and quotation marks omitted).

Therefore, "[f]or the continuing violation doctrine to apply, [Plaintiff] needs to establish that a discriminatory 'anchoring act' occurred within the limitations period." Lockridge v. The University Of Maine System, 597 F.3d 464, 474 (1st Cir.2010) (citing Noviello v. City of Boston, 398 F.3d 76, 86 (1st Cir.2005)). "To qualify as an anchoring act, the discriminatory act must 'substantially relate[ ] to [the] earlier incidents of abuse.'" Lockridge, 597 F.3d at 474 (internal citations omitted). "In O'Rourke, [the First Circuit Court of Appeals] explained that a court, when ascertaining whether an anchoring act is 'substantially related' to an untimely act, should ask if the subject matter of the anchoring act is 'sufficiently similar' to that of the untimely act." Lockridge, 597 F.3d at 474 n. 7 (citing O'Rourke, 235 F.3d at 731).

The court will now summarize the relevant facts and allegations in this case in order to determine whether or not the Plaintiff submitted a timely claim of sexual harassment.

To establish her hostile work environment claim, Levine relies mainly on the incident that brought about her internal complaint of sexual harassment in December of 2006, when she complained in writing to Vilma Benítez from the

Defendant's Human Resources department that Carreras made inappropriate comments of a sexual nature to her. Shortly thereafter, Plaintiff received a memo from the Human Resources department after an alleged investigation took place. The memo stated that Carreras had recognized that his comments had been "unfortunate." Following this memo, Levine admits that Carreras ceased making comments of a sexual nature, but instead, began threatening her. Plaintiff contends that Carreras began threatening her after she filed the complaint by allegedly telling her that he was going to screw her ("la iba a joder"). See Docket No. 34-3 at pages 98-99. This allegation, however, is in dispute.

In September of 2007, ten months after her internal complaint of sexual harassment, the Plaintiff was placed on some sort of probation period due to performance shortcomings. Then, in November of 2007, she was admonished twice for incidents that she refuted. Between this time and February of 2009, the record is devoid of any act on the part of the Defendant that could be deemed an unlawful employment practice.

In February of 2009, the Defendant granted Plaintiff's request for a change in schedule and she was allowed to take a 30 minute meal period so that she could leave work at 4:30p.m, instead of 5:00p.m., enabling her to pick up her newborn son from daycare and take him to occupational therapies. In July of 2009, the Plaintiff asked her direct supervisor, Carrasquillo, for a permanent change in her work schedule from 7:30a.m. to 4:30p.m. or, instead, to be able to work Saturdays as opposed to Fridays so she could have an available weekday to take her son to medical appointments. Her request was not granted. Then, on July 13, 2009, Carrasquillo sent an email to Levine informing her that the vacation she had scheduled from July 27 until August 7, 2009 was going to be cancelled because she had exhausted all leave. Levine replied acknowledging that she had no leave hours available at that time.

On July 31, 2009, the Plaintiff called the Defendant's Ethics Line to lodge a complaint about how, according to Levine, Carreras intimidated and harassed the Call Center employees. At this time, Carreras was Carrasquillo's direct supervisor. In connection to this call, on August 13th, 2009, the Plaintiff also sent an email to Damaris Cruz from Associate Relations wherein she complained, among other things, about the general lack of training and about Carreras. Specifically, Levine described him as "intimidating" and complained that after she filed the internal sexual harassment complaint against him, her work environment had become tense causing her to suffer from her nerves. According to the Plaintiff in her email, Carreras was watchful of

her personal conversations, denied her participation in a focus group she had been invited to by Human Resources and denied her request for a change in work schedule. In another email to Cruz on August 17th, 2009, the Plaintiff described a series of what she deemed "tense situations" with Carreras.

On September 14, 2009, the Plaintiff made a request to her supervisor, Carrasquillo, for a change in work schedule from full-time to part-time.  He asked her to put the request in writing and it is contested whether or not she did.[4] On September 25, 2009, Levine spoke to Cruz on the phone about her "discomforts" and the latter advised the Plaintiff that the decision to change her work schedule was for the Human Resources department to make. The requested change, however, never took place. Additionally, between July and October of 2009, Levine made several calls to the Defendant's Ethics Line in order to make inquiries regarding the leaves of absence she was entitled to, paid or unpaid.

On October 2, 2009, Cruz sent Levine an email informing that the investigation regarding the complaint she made on July 31, 2009 was closed for lack of merit. Moreover, on October 5, 2009, Levine was notified that she had to take a meal period of one hour and that, she would no longer have the 30-minute meal period reduction. Therefore, Levine would have to return to her 8:00a.m. to 5:00p.m. work schedule. On that same date, Levine once again sent an email to Carrasquillo requesting a change in schedule in order to be able to take her infant son to occupational therapies. During the month of October of 2009, Levine was absent because she, her daughter and her son got sick. Levine contacted her supervisor and the sick line to inform her absences and provided medical certificates for the same. However, her termination became effective on October 30, 2009. Benítez, Carreras and Carrasquillo allegedly decided to terminate Levine because of her excessive absenteeism.

In its motion for summary judgment, the Defendant contends that the Plaintiff's claim of sexual harassment is simply time-barred. See Docket No. 23 at pages 14-15. In an effort to avoid dismissal, Levine argues that the Defendant committed "a series of incidents, continuing violations, all of them, *although different in kind*, however related between each other, that

---

[4] On September 14, 2009, Levine called Carrasquillo and requested a reduction of hours from full to part time for a period of three (3) months. Carrasquillo asked her to submit the requested in writing. The Defendant submits that Levine never submitted the request in writing, which the Plaintiff denies. The Defendant supports its contention by means of a sworn statement from Benítez, see Docket No. 22-14, and the Plaintiff denies it in her own sworn statement, see Docket No. 34-2 ¶ 33.

undoubtedly were discriminatory … .” <u>See</u> Docket No. 34 (emphasis ours). <u>See</u> Docket No. 34 at page 5. Therefore, she claims that the “continuing violation doctrine” allows her to rely on the untimely acts that took place in 2006. <u>See id.</u>

Because the Plaintiff filed a claim with the EEOC on December 4, 2009, the court must consider all incidents of discrimination until as far back as February 7, 2009 in order to determine whether or not, in accordance with the continuing violations doctrine, an anchoring event took place within the limitations period. During these 300 days, the Defendant effectively denied Plaintiff’s requests for a change in work schedule; cancelled her vacations for having exhausted leave; closed an investigation regarding her complains about “tense” situations in the workplace with Carreras for alleged lack of merit; and, terminated her employment. While many of these may have caused the Plaintiff to be displeased, none of them qualifies as an anchoring act for purposes of a sexual harassment claim under Title VII because the Plaintiff simply fails to establish that the harassment that she claims created a hostile work environment was based on her sex. <u>See</u> <u>Medina-Rivera</u>, 713 F.3d at 137 n. 2; <u>Forrest</u>, 511 F.3d at 228. In fact, Plaintiff admitted during her deposition that Carreras ceased making comments of a sexual nature after the close of the Human Resources’ investigation in December of 2006.

Unfortunately for Levine, the incidents that in fact occurred within the applicable period do not fill the void as they are of a “wholly different character, and, moreover, [they have] not been traced to any discriminatory animus. … Common sense teaches that a plaintiff cannot resuscitate time-barred acts, said to be discriminatory, by the simple expedient of linking them to a non-identical, non-discriminatory, non-time-barred act.” <u>Lawton v. State Mut. Life Assur. Co. of America</u>, 101 F.3d 218, 222 (1st Cir.1996) (internal citations omitted). Therefore, the court finds that nothing ties these incidents to the now time-barred, ostensibly meritorious sexual harassment claim. <u>See</u> <u>Perez v. Horizon Lines, Inc.</u>, No. 11-2083, 2013 WL 5346856 at *9 (D.P.R. September 23, 2013).

“Our conclusion that [Plaintiff] cannot avail herself of the continuing violation doctrine sounds the death knell for her hostile work environment claim. Without reliance on the untimely events, the claim fails as a matter of law.” <u>Lockridge</u>, 597 F.3d at 474. Consequently, the Defendant’s request that the Plaintiff’s sexual harassment claim under Title VII be dismissed is hereby **GRANTED**.

### 2. Retaliation

Title VII makes it unlawful for an employer to retaliate against a person who complains about discriminatory employment practices. See 42 U.S.C. § 2000e-3(a). Title VII's anti-retaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3 (a). To succeed on a retaliation claim, a plaintiff must first prove these elements: (1) that she undertook protected conduct; (2) that her employer took a material adverse action against her; and, (3) that a causal nexus exists between elements one and two. See Medina-Rivera, 713 F.3d at 139 (internal citations omitted).

As previously set forth, an employee must first timely exhaust administrative remedies before presenting his or her Title VII claim in federal court. See Noviello, 398 F.3d at 85. However, because the state or local agency in Puerto Rico in which the person aggrieved can file charges has no jurisdiction over Title VII retaliation claims, "claims for retaliation must be filed *with the EEOC within 180 days* from the events complained of." Rivera Abella, 470 F.Supp.2d at 103 (emphasis ours).

> Even though Puerto Rico is a deferral jurisdiction and a plaintiff can file a charge of discrimination with the EEOC within 300 days after the alleged unlawful employment practice occurred, the EEOC has not conferred the Antidiscrimination Unit in Puerto Rico with jurisdiction to hear claims for retaliation under Title VII. … In such a case, claimant will have 180 days, not 300 days, from the alleged unlawful employment practice to file a charge of retaliation under Title VII with the EEOC.

Perez v. Developers Diversified Realty Corp., 904 F.Supp.2d 156, 168 (D.P.R. 2012) (internal citations and quotation marks omitted).

During the discussion regarding Plaintiff's claims of retaliation under Title VII, the Defendant first argues that all claims prior to May 28, 2009[5] should be dismissed as time-barred. See Docket No. 23 at pages 22-23. The Plaintiff opposed the Defendant's contention arguing, once again, that the

---

[5] There are 190 days, and not 180, between May 28, 2009 and December 4, 2009, and thus, the court will presume the Defendant's calculations are mistaken. The limitations period should run until June 7, 2009, instead.

continuing violation doctrine renders all incidents of retaliation timely. See Docket No. 34 at page 4.

The Supreme Court in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), held "that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period—180 or 300 days—set forth in 42 U.S.C. § 2000e-5(e)(1)." Id. at 122 (emphasis ours). Examples of discrete acts of discrimination include termination, failure to promote, denial of transfer, refusal to hire, see id. at 114, as well as, a job transfer, a letter of warning, and an adverse performance evaluation, see Miller v. New Hampshire Dept. of Corrections, 296 F.3d 18, 22 (1st Cir.2002).

Because the Plaintiff filed a charge for retaliation before the EEOC on December 4, 2009, any discrete retaliatory act that took place before June 7, 2009 shall be deemed time-barred. As summarized in the previous section, after the Plaintiff complained of sexual harassment on the part of Carreras in December of 2006, which is the first time she engaged in protected conduct, the Defendant placed Levine in some sort of probationary period in September of 2007 because of performance shortcomings. Additionally, in November of 2007, she received a disciplinary warning and was verbally admonished on two different occasions. Pursuant to the applicable caselaw, the foregoing are all discrete acts that fall outside the filing period and are thus untimely.

With regards to Plaintiff's claim of retaliatory harassment, the First Circuit Court of Appeals has held that "subjecting a party to a hostile work environment in retaliation for protected activity may be actionable under … Title VII … ." Noviello, 398 F.3d at 91-92. However, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. … The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years … ." Morgan, 536 U.S. at 115 (internal citations omitted).

The Plaintiff also alleges that as a result of her sexual harassment complaint against him in 2006, Carreras began threatening her by telling her that he was going to "screw her" ("te voy a joder"). However, in her opposition to the Defendant's motion for summary judgment, the Plaintiff has failed to adduce to a single act of retaliatory intimidation or harassment on the part of Carreras that took place within the filing period and is both materially adverse and substantially related to the events that ensued after her complaint of sexual harassment in 2006. See Lockridge, 597 F.3d at 474

(holding that to qualify as anchoring act for purposes of hostile work environment claim, the discriminatory act must substantially relate to earlier incidents of abuse). Plaintiff's bald and general assertions that Carreras continually harassed her are insufficient to avoid *brevis* disposition as to this claim. See Gutierrez-Lines v. Puerto Rico Elec. and Power Authority, 751 F.Supp.2d 327, 344 (D.P.R. 2010) (holding plaintiff's bald assertions in summary judgment papers that former supervisor generally intensified discrimination against him after filing EEO complaint, without any supporting evidence, were insufficient to establish adverse action element of prima facie case of retaliation under ADEA). Consequently, as argued by the Defendant, the Plaintiff's claim of retaliation based on the incidents that ensued from her complaint of sexual harassment in 2006 is time-barred.[6]

We shall now address the merits of the alleged retaliatory acts that took place within the 180-day filing period prior to December 4, 2009, when Levine filed her EEOC claim. During this time, it is uncontested that in July of 2009, the Plaintiff asked Carrasquillo for a permanent change in her work schedule, which was not granted. Then, on July 31, 2009, the Plaintiff called the Defendant's Ethics Line and complained about how Carreras intimidated and harassed employees. In subsequent e-mails to Cruz from Associate Relations during the month of August of 2009, the Plaintiff described Carreras as intimidating and complained that after she filed the internal sexual harassment complaint against him, her work environment had become tense. With regards to these communications, the Defendant contends that "the complaint she filed on July 31, 2009 before the Ethics Line does not translate into a sexual harassment complaint protected under Title VII." Docket No. 23 at page 24. In essence, the Defendant's position is that these complaints do not amount to "protected activity" as required by Title VII. The court disagrees.

"[P]rotected conduct under Title VII's anti-retaliation provision is not limited to filing an administrative charge of discrimination. It expressly prohibits retaliation for 'oppos[ing] any practice made an unlawful practice' by Title VII." Petrarca v. Southern Union Co., No. 04-310S, 2007 WL 547690 at *12 (D.R.I. 2007) (citing 42 U.S.C. § 2000e-3(a)). See also Perez-Cordero v.

---

[6] Notwithstanding, the Plaintiff may use "the prior [time-barred] acts as background evidence in support of [any] timely claim." Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d 37, 42 n. 4 (1st Cir.2002) (citing Morgan, 536 U.S. at 113). See also United Airlines Inc. v. Evans, 431 U.S. 553, 558 (1977) (explaining that prior acts outside the statutory period "may constitute relevant background evidence" of employment discrimination).

Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 31 (1st Cir.2011) (finding plaintiff's reporting of complaints to his superiors about the harassment to which he was subjected suffice to show his "opposition" to that harassment, within the meaning of Title VII); Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir.2000) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, 'including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'"). In accordance with the applicable caselaw, the court finds that Levine's call to the Defendant's Ethics Line and her e-mails to Cruz voicing her concerns about what she perceived was retaliatory intimidation and/or harassment on the part of Carreras are sufficient to meet the protected conduct element of her Title VII retaliation claim.

The Defendant moves to dismiss the Plaintiff's retaliation claim under Title VII on the grounds that her termination in October of 2009 is not causally linked to her sexual harassment complaint almost three years prior in 2006 because of the lack of temporal proximity. See Docket No. 23 at pages 24-25. The court finds two problems with the Defendant's argument.

First of all, her termination is in fact temporally close to her complaints in July and August of 2009, which the court has deemed to be protected conduct on the Plaintiff's part. The First Circuit Court of Appeals had held that temporal proximity of an employee's protected activity to an employer's adverse action is a source of circumstantial evidence that, *theoretically*, can demonstrate retaliation in a way sufficient to leap the summary judgment hurdle. See Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir.1991). "Where the evidence shows only that the decisionmaker knew of the complainant's protected conduct at the time the adverse employment action was taken, causation may be inferred from a very close temporal relationship between the protected activity and the adverse action." Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir.2011) (citations omitted). "Periods of three or four months have been held to be insufficient to support such an inference." Id. (citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir.2004)). In the case at hand, the Plaintiff's termination became effective on October 30, 2009, less than three months after she lodged her complaints. Therefore, the Plaintiff has definitely established

the element of causation of her prima facie claim of retaliation under Title VII for her termination.

The second problem with the Defendant's request for dismissal of Levine's Title VII retaliation claim is that Levine's termination was not the only material adverse action the Defendant took against her during the applicable period. During the weeks after Plaintiff engaged in protected conduct in July and August of 2009, the Defendant denied Levine's multiple and different requests for a change in work schedule and, on top of that, informed her that she would no longer have the 30-minute meal period reduction that allowed her to leave at 4:30p.m., just in time to take her son to therapy.

In Burlington N. & S.F.R. Co. v. White, 548 U.S. 53 (2006), the Supreme Court held that Title VII's anti-retaliation provision must be construed to cover a broad range of employer conduct because in contrast to Title VII's substantive provision, Title VII's anti-retaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment. Id. at 64.

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. … In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Id. at 68 (internal citations and quotation marks omitted). In Burlington, the Supreme Court also found that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Id. at 69 (citing Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (C.A.7 2005) (finding flex-time schedule critical to employee with disabled child)). There is no doubt that a change in work schedule mattered enormously to Levine, a single mother of two children, one of which suffered from autism and required therapy. The Defendant, however, overlooked addressing this materially adverse action in its requests for dismissal of Levine's retaliation claim. That being the case, the court finds that, like the Plaintiff's termination, her materially adverse change in work schedule is temporally close to Levine's protected activity and causality can be thus inferred at this stage of the proceedings for purposes of this claim.

"If a plaintiff makes out a prima facie case of retaliation (and there is no dispute on that issue here), a rebuttable presumption of unlawful

retaliation arises and 'the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision.'" Vera v. McHugh, 622 F.3d 17, 32 (1st Cir.2010) (citing Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir.2003)). "In order to rebut that presumption, the employer does not have the burden of persuasion, but must simply produce evidence of a legitimate, nondiscriminatory reason for the employment action." Vera, 622 F.3d at 32 (citing Reeves, 530 U.S. at 142). "If the defendant meets the burden, the plaintiff must then 'show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.'" Rios v. Municipality of Guaynabo, 938 F.Supp.2d 235, 248 (D.P.R. 2013) (citing Roman v. Potter, 604 F.3d 34, 39 (1st Cir.2010)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662-663 (1st Cir.2010) (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)).

To that effect, the Defendant asserts in its motion for summary judgment that the Plaintiff was terminated because of her continued absenteeism after having exhausted all her vacation, sick and FMLA leaves available. See Docket No. 23 at pages 24-25. According to Levine, however, the Defendant's proffered reason is pretextual because she had indeed provided the Defendant with the medical certificates it requested before the October 30th, 2009 deadline imposed by the Defendant in order to avoid termination, as per the terms of the October 27th, 2009 memo.[7] See Docket No. 34 at page 11, 17-20.

Levine's absences during the month of October of 2009 are uncontested. And while the Defendant sets forth that it terminated Plaintiff from her employment effective October 30, 2009 for excessive absenteeism in violation of Humana's Attendance Expectations policy, the truth of the matter is that the memo dated October 27, 2009 granted the Plaintiff until October 30, 2009 to submit evidence about her absences, otherwise, the Defendant would understand that she was abandoning her employment. See Docket No. 30-9. Levine

---

[7] The Plaintiff also argued that during some phone conversations she held with some of Defendant's officers prior to her termination, Carrasquillo and someone by the name Rosario led her to believe that her absences in October of 2009 could be covered under the FMLA leave she still had available. She also claims that she maintained contact with her supervisors and called the sick line during her absences. See Docket No. 34-1 at ¶ 47.

now claims she contacted her supervisor and the Defendant's sick line to notify her absences and provided medical certificates for the same before the October 30th deadline. Moreover, the Plaintiff alleges that on October 27, 2009, she gave Carrasquillo the requested medical certificates regarding her son's hospitalization and her daughter's bronchitis. See Docket No. 34-1 at ¶ 61, Docket No. 34-4 at pages 224-225. Notwithstanding, despite allegedly complying with the Defendant's demands in order to avoid termination, she was discharged anyways. In light of the parties' conflicting versions of events, the court finds that the facts that lead to the Plaintiff's termination are very much in dispute. Furthermore, because this issue involves elusive questions of motive and intent, courts should be cautious in granting an employer's motion for summary judgment when a case comes down to such a determination. See Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir.1998).

Finally, with regards to the Plaintiff's change in work schedule in October of 2009, the brief explanation the Defendant offered for changing her meal period back to an hour - to wit, that the arrangement was always temporary - contrasts with the Plaintiff's version of events.[8] Therefore, viewing the evidence in the light most agreeable to the Plaintiff and giving her the benefit of any and all reasonable inferences, the court finds that genuine issues of material facts exist as to whether the Defendant's proffered reasons for changing the Plaintiff's schedule are a pretext designed to mask retaliation for complaining about Carreras and what she perceived as retaliatory harassment.

As a result, the Defendant's motion for summary judgment is **DENIED** as to the Plaintiff's retaliation claim under Title VII.

**B. Supplemental State Law Claims**

The Plaintiff also invoked supplemental jurisdiction over her state law claims under Laws No. 100, 17 and 69, which prohibit sex discrimination; Law No. 115, the state's anti-retaliation statute; and, Law No. 80, which penalizes wrongful discharges as defined by the statute.

**1. Laws No. 100, 69, 17**

"Law 100 is a broad antidiscrimination statute analogous to Title VII in many respects." Perez-Cordero, 656 F.3d 19, 26 n. 10 (1st Cir.2011)

---

[8]In her opposition, Levine claims she was never informed that the reduction in her meal period was a temporary arrangement. See Docket No. 34-1 at ¶ 39; Levine's deposition, Docket No. 34-4 at pages 180-181; Levine's affidavit, Docket No. 34-2 at ¶ 27.

(citing <u>Monteagudo v. Asociación de Empleados del Estado Libre Asociado de</u> <u>P.R.</u>, 554 F.3d 164, 169 n. 3 (1st Cir.2009) (describing Law 100 as an analogue to Title VII)). Law 100 provides, in pertinent part, that:

> Any employer who discharges, lays off or discriminates against an employee regarding his/her salary, wage, pay or remuneration, terms, rank, conditions or privileges of his/her job, … , or who limits or classifies his/her employees in any way which tends to deprive a person of employment opportunities, or that affects his/her status as employee because of his/her age, … , race, color, sex, social or national origin, social condition, political affiliation or political or religious ideology of the employee or applicant for employment, or for being a victim or perceived as a victim of domestic violence, sexual aggression or stalking … shall incur civil liability … .

P.R. LAWS ANN. tit. 29, § 146. In her response, the Plaintiff requested the dismissal of her claims of discrimination on the basis of sex and gender under both Title VII and the local statutes, <u>see</u> Docket No. 34 at page 1. Thus, her sex discrimination claim under Law No. 100 is hereby **DISMISSED WITH PREJUDICE.**

Puerto Rico Law No. 17 provides that sexual harassment in employment is "an illegal and undesirable practice," P.R. LAWS ANN. tit. 29, § 155. On the other hand, Law No. 69 bars discrimination in employment on the basis of sex. <u>See</u> P.R. LAWS ANN. tit. 29, § 1321. "Law 17 and 69 serve virtually the same purposes and outlaw essentially identical behavior, and Law 69's specific prohibition on gender discrimination overlaps with Law 17's bar on sexual harassment." <u>Gerald v. Univ. of P.R.</u>, 707 F.3d 7, 28 (1st Cir.2013) (citing <u>García v. Sprint PCS Caribe</u>, 841 F.Supp.2d 538, 564 (D.P.R.2012)). Moreover, "[t]he First Circuit has determined that Title VII's, Law 17's, … prohibitions against gender discrimination and sexual harassment 'serve virtually the same purposes and outlaw essentially identical behavior.'" <u>Perez v. Horizon Lines, Inc.</u>, 2013 WL 5346856 at *12 (citing <u>Gerald</u>, 707 F.3d at 28). That is, "the substantive law of Puerto Rico on sexual harassment appears to be aligned with Title VII law; the latter's precedents being used freely to construe the former." <u>Gerald</u>, 707 F.3d at 28. Therefore, for the same reasons that the Plaintiff's sexual harassment claim under Title VII did not progress, her claims for sexual harassment under both Law No. 17 and 69 must suffer the same fate. As a result, the same are hereby **DISMISSED WITH PREJUDICE.**

Notwithstanding the foregoing, both Law No. 17 and 69 support a cause of action for retaliation. To that effect, Law No. 17 provides that:

> [a]n employer shall be held liable pursuant to the provisions of [Law No. 17] when he carries out any action that results in adversely affecting the opportunities, terms and working conditions of any person who has rejected the employer's practices that are in conflict with the provisions of [Law No. 17] or who has filed a complaint or suit, given testimony, collaborated or participated in any other manner in an investigation, procedure or hearing that is initiated under [Law No. 17].

P.R. LAWS ANN. tit. 29, § 155h. See also Matos Ortiz v. Puerto Rico, 103 F.Supp.2d 59, 63 (D.P.R. 2000) (noting Law 17 supports sexual harassment and retaliation claims). On its part, Law No. 69 makes it unlawful for an employer "to dismiss or discriminate against any employee or participant who files a complaint or charge, or is opposed to discriminatory practices, or participates in an investigation or suit for discriminatory practices against the employer … ." P.R. LAWS ANN. tit. 29, § 1340.

The Defendant failed to properly brief the court as to why Plaintiff's retaliation claims under Laws No. 17 and 69 should be dismissed. Therefore, given the Plaintiff created a triable issue of fact as to her claim of retaliation under Title VII for the internal complaints she lodged in both July and August of 2009, her retaliation claims under Laws No. 17 and 69 shall survive as well. See Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 n. 3 (1st Cir.2010) (noting defendant's concession of shared analysis of Title VII and Laws No. 17 and 69 retaliation claims obviates need for separate analysis); see also Perez-Cordero, 656 F.3d at 25 n. 10 (finding such substantial overlap between Title VII and Laws No. 100 and 17 that failure to brief the distinction merits applying the Title VII ruling to the state claim).

## 2. Law No. 80

"Puerto Rico Law 80 requires employers to compensate employees who are discharged without just cause." Baltodano v. Merck, Sharp & Dohme (I.A.) Corp., 637 F.3d 38, 41-42 (1st Cir.2011) (citing P.R. LAWS ANN. tit. 29, § 185a). "An employee who establishes that he was discharged shifts the burden of persuasion to the employer to prove that the discharge was justified." Zapata v. Univision Puerto Rico, Inc., 914 F.Supp.2d 156, 180 (D.P.R. 2011) (citations omitted). Pursuant to Law No. 80, "[g]ood cause may include an employee's improper and disorderly conduct, negligent

attitudes toward her work, and violations of the employer's policies." <u>García v. Sprint PCS Caribe</u>, 841 F.Supp.2d at 565.

In its motion for summary judgment, the Defendant argues that the Plaintiff's wrongful discharge claim under Law No. 80 must be dismissed because she was terminated for good cause, to wit, her absenteeism. <u>See</u> Docket No. 23 at pages 27-29. However, as discussed in connection with Plaintiff's Title VII retaliation claim, a triable issue of fact exists as to whether she was discharged in retaliation for the complaints of retaliatory harassment she made in July and August of 2009. Because this would not be just cause under § 185b, the Defendant is not entitled to summary judgment on Levine's Law No. 80 claim for wrongful discharge.

**3. Law No. 115**

Law No. 115 provides that an employer "may not discharge, threaten, or discriminate against an employee regarding the terms, conditions, compensation, location, benefits or privileges of the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico." <u>García v. Sprint PCS Caribe</u>, 841 F.Supp.2d at 565 (<u>citing</u> P.R. Laws. Ann. tit. 29, § 194a(a)). The Defendant requests the dismissal of this claim because the Plaintiff did not engage in protected conduct because she did not offer or attempt to offer testimony in the fora listed in the statute. <u>See</u> Docket No. 23 at pages 29-30. The court agrees with the Defendant. Levine has failed to produce any evidence that she offered or attempted to offer testimony or information either to a legislative, administrative or judicial forum in Puerto Rico before her dismissal. Hence, Humana is entitled to summary judgment on Levine's Law No. 115 claim, which is hereby **DISMISSED WITH PREJUDICE.**

### IV. CONCLUSION

For the reasons stated above, this Court hereby **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment (Docket No. 22-23). Accordingly, Plaintiff's claims under the Constitution of the United States of America and the Commonwealth of Puerto Rico, as well as her claims for sex discrimination and sexual harassment under Title VII and Laws No. 100, 17 and 69 are hereby **DISMISSED WITH PREJUDICE.** Plaintiff's claim of retaliation under Law No. 115 is also **DISMISSED WITH PREJUDICE.** Notwithstanding, the Plaintiff's claims of retaliation pursuant to Title VII and Laws No. 17 and 69 for the

events that took place after engaging in protected conduct in July and August of 2009, and her claim of wrongful discharge under Law No. 80 remain.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, January 2, 2014.


                                        S/ JUAN M. PEREZ-GIMENEZ
                                        JUAN M. PEREZ-GIMENEZ
                                        U.S. DISTRICT JUDGE